# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3    GEODYNAMICS, INCORPORATED,   *
              Plaintiff,           *
 4                                 *
      VS.                          *   Civil Action No.
 5                                 *   2:17-cv-00371-RSP
                                   *
 6    DYNAENERGETICS US., INC.,    *
      et al.,                      *
 7            Defendants.          *

 8    *****************************************************

 9             ORAL AND VIDEOTAPED DEPOSITION OF
                       DR. GARY WOOLEY
10                     JULY 18, 2018

11                   HIGHLY CONFIDENTIAL
                    OUTSIDE COUNSEL ONLY
12
      *****************************************************
13

14              DEPOSITION of DR. GARY WOOLEY,

15    produced as a witness at the instance of the

16    Defendants, and duly sworn, was taken in the

17    above-styled and numbered cause on the 18th day of

18    July, 2018, from 10:02 a.m. to 5:29 p.m., before

19    Christy R. Sievert, CSR, RPR, in and for the State

20    of Texas, reported by machine shorthand, at the

21    offices of McKool Smith, 300 Crescent Court, Suite

22    1500, Dallas, Texas 75201, pursuant to the Federal

23    Rules of Civil Procedure and the provisions stated

24    on the record or attached hereto.

25
```

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 3 of 12 PageID #: 7453

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only        Dr. Gary Wooley on 07/18/2018        Pages 2..5

Page 2

```
 1            A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4    MR. ERIK B. FOUNTAIN
      McKool Smith
 5    300 Crescent Court, Suite 1500
      Dallas, Texas  75201
 6    Phone:    214-978-4241
      E-mail:   efountain@mckoolsmith.com
 7
 8  FOR THE DEFENDANTS:
 9    MR. PRESTON H. HEARD
      Womble Bond Dickinson
10    271 17th Street NW, Suite 2400
      Atlanta, Georgia  30363
11    Phone:    404-872-7000
      E-mail:   preston.heard@wcsr.com
12
      MR. WILLIAM HUBBARD
13    Womble Bond Dickinson
      100 Light Street, 26th Floor
14    Baltimore, Maryland  21202
      Phone:    410-545-5800
15    E-mail:   will.hubbard@wbd-us.com
16
    ALSO PRESENT:
17
    LUIS ACEVEDO, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
                                          PAGE
 2
    Appearances................................. 2
 3
    Exhibits.................................... 4
 4
    Proceedings................................. 5
 5
    DR. GARY WOOLEY:
 6
       Examination by Mr. Heard................. 5
 7     Examination by Mr. Fountain............ 260
       Examination by Mr. Heard............... 262
 8
    Changes and Signature................ 264-265
 9
    Reporter's Certification............. 266-267
10
11
12
...
25
```

Page 4

```
 1              E X H I B I T S
 2  NUMBER       DESCRIPTION                    PAGE
 3  Exhibit 1    Expert Report                    49
 4  Exhibit 2    U.S. Patent No. 8,220,394       104
 5  Exhibit 3    Deposition transcript           120
              John Hardesty, 5-31-18
 6
    Exhibit 4    10-3-14 letter to D. Carstens   122
 7            from C. Wait
              GEOD3 000974 - 000982
 8
    Exhibit 5    Transcript of Malte Veehmayer   188
 9            6-22-18
10  Exhibit 6    Rebuttal Expert Report          194
11  Exhibit 7    U.S. Patent No. 8,544,563       220
12  Exhibit 8    Exhibit D                       223
13  Exhibit 9    World Intellectual Property     224
              Organization, Publication date
14            April 21, 2005
15  Exhibit 10   Exhibit A                       237
16  Exhibit 11   Deposition excerpt              244
              Phillip Duncan Church, 8-17-17
17
    Exhibit 12   J. Delacour, Shaped Explosive   252
18            Charge Devices
19  Exhibit 13   A Survey of Combustible         252
              Metals, Thermites, and
20            Intermetallics for Pyrotechnic
              Applications
21
...
25
```

Page 5

```
 1              P R O C E E D I N G S
 2       THE VIDEOGRAPHER:  We're on the record
 3  for the deposition of Gary Wooley.  The time is
 4  10:02 a.m. on July 18, 2018, in the matter of
 5  GEODynamics, Inc., versus DynaEnergetics U.S., Inc.,
 6  Civil Action No. 217-cv-00371-RSP, being held in the
 7  United States District Court for the Eastern
 8  District of Texas, Marshal Division.
 9       The court reporter is Christy Sievert.
10  The videographer is Luis Acevedo, both
11  representatives of Huseby.
12       Will counsel please state their
13  appearances for the record.
14       MR. HEARD:  Preston Heard of Womble
15  Bond Dickinson for DynaEnergetics.  And with me is
16  Will Hubbard.
17       MR. FOUNTAIN:  Erik Fountain from
18  McKool Smith, here today on behalf of GEODynamics.
19            DR. GARY WOOLEY
20         having been first duly sworn,
21            testified as follows:
22              EXAMINATION
23  BY MR. HEARD:
24    Q.  Good morning, Dr. Wooley.
25    A.  Good morning.
```

Page 54

1    A.   Yes.
2    Q.   And HMX?
3    A.   Uh-huh (affirmative response). I'm aware
4 they -- they exist. Don't know a lot about them.
5    Q.   Do you know whether those are classified as
6 military-grade explosives?
7    A.   By whom? I mean, it's not a standard.
8 It's just a common terminology that's used.
9    Q.   Sure. Well, based on it the way you use it
10 here in Paragraph 14, you say that Connex charges
11 use military-grade explosives, and I'm trying to
12 understand if those explosives are different than
13 explosives used in conventional charges.
14    A.   Yes, I would -- I would expect that --
15 that's part of this description.
16    Q.   So this -- the description of the use of
17 military-grade explosives, again, came from some
18 GEO-provided materials?
19    A.   Yes.
20    Q.   Okay.
21    A.   Well, and confirmed through conversation,
22 but yes. The answer to that is "yes."
23    Q.   And then similarly with the last sentence,
24 you state that "GEO worked tirelessly to build a
25 market for reactive liner perforating charges in

Page 55

1 both U.S. and global markets."
2        Again, that's not based on your
3 independent technical expertise and understanding,
4 that's based on what GEO told you?
5    A.   Yeah. It's not because I was there
6 watching them until they were tireless. It was
7 their words, and I -- you know, after some
8 conversation, I said, "I'll just use your words."
9    Q.   And you've been -- again, you've been in
10 the industry for a long time. You have seen
11 companies work to market new products, I assume?
12    A.   Yes.
13    Q.   And you understand that that doesn't confer
14 patentability on that new product every time? You
15 understand that?
16    A.   Yes.
17    Q.   In Paragraph 15, you turn to describing
18 DynaEnergetics' development of reactive shaped
19 charges; is that correct?
20    A.   Yes.
21    Q.   It looks like in here, you -- you note that
22 both Mr. McNelis and Mr. Price testified that
23 DynaEnergetics were -- began developing the
24 reactive -- a reactive shaped charge in the early
25 2000s. Do you see that?

Page 56

1    A.   Yes.
2    Q.   And in particular, Mr. Price testified that
3 that was done in conjunction with the military
4 section of the Dynamit Nobel business?
5    A.   That's my understanding.
6    Q.   And you point to a master's thesis, the
7 Vebis thesis. Have you reviewed that document?
8    A.   Yes, I think I've seen it. I saw. . .
9    Q.   And you note in Paragraph 16 -- you state
10 that you were unable to find a single document which
11 shows that Dyna considered, tested, or manufactured
12 a shaped charge containing both nickel and aluminum
13 until 2007. Did you see that?
14    A.   Yes.
15    Q.   How did you search for documents?
16    A.   Well, I asked. I looked at some of the
17 documents that I did see, and we had this
18 conversation about timing. Asked is there anything
19 else that goes back that far. I think I asked John
20 Hardesty and the lawyers. And based on those
21 conversations and what I did see, I was able to make
22 this statement.
23    Q.   I just wanted to make sure that when you
24 say you were unable to find, you weren't given carte
25 blanche to the whole discovery -- all the documents

Page 57

1 produced in discovery and you ran searches on your
2 own.
3    A.   That's correct, I did not do that.
4    Q.   Okay. Were you aware that Malte Veehmayer,
5 a former R&D manager at Dyna, was deposed in this
6 case?
7    A.   Yes, I believe that's -- I did -- I did
8 know that.
9    Q.   And did -- have you reviewed his deposition
10 transcript?
11    A.   I had conversations about the testimony,
12 but I -- as I recall, it was fairly recent.
13    Q.   Yes.
14    A.   And I don't think I've seen the transcript,
15 except -- with the exception of some excerpts.
16    Q.   Okay. So it's fair to say that you
17 didn't -- and, again, I understand timing is an
18 issue. But in -- for these paragraphs, you did not
19 have the benefit of reviewing Malte Veehmayer's
20 deposition transcript. Is that fair?
21    A.   The entire transcript, that's correct, yes.
22    Q.   And at least it's not referenced in here in
23 any way?
24    A.   Correct.
25    Q.   Do you recall being shown a document, a

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 5 of 12 PageID #:  7455

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only | Dr. Gary Wooley on 07/18/2018 | Pages 94..97

Page 94

1  identified?
2     A.  Testimony by DynaEnergetics.
3     Q.  Okay.
4     A.  I read that testimony, have opinions about
5  what they said, and those are described here in
6  these paragraphs.  And I take that to not be
7  comments or input from GEODynamics.  Now, of course,
8  I got the deposition from the lawyers for
9  GEODynamics, but it's --
10    Q.  Sure.
11    A.  -- it's testimony by DynaEnergetics.  And
12 based on what they said and my understanding of the
13 technology, I have comments in here about that.
14    Q.  So Paragraph 14, which of those statements
15 do you believe is -- was formed on the basis solely
16 of your independent technical expertise?
17    A.  Okay.  We've talked about the fact that
18 much of this description of -- of GEO is based on
19 their own words, after I've had some conversation
20 with them.  But the parts that I was already aware
21 of is, they were a global player.  I knew they were
22 global, and they dealt with downhole completions,
23 and that they were based in Millsap, Texas.
24    Q.  Okay.
25    A.  Now, some of the other descriptions -- and

Page 95

1  they deal with wireline-conveyed solutions.  Some of
2  the other descriptions of that, I've already
3  commented on, was some of their own words.
4        The fact that GEO sells conventional oil
5  well completions was something I was aware of.
6     Q.  And just to ask you -- stop you, Dr. Wooley,
7  did that require your independent technical
8  expertise to form those -- that statement, to
9  recount that fact?
10    A.  I don't understand that question.  Did it
11 require it?  It was knowledge that I had already
12 before GEO told me, which is what I understood your
13 question to be about:  What did -- what's in here
14 that was not told to me by GEO?
15    Q.  Is there an opinion that you have formed on
16 the basis -- from your independent technical
17 expertise that's reflected in that statement?
18       MR. FOUNTAIN:  Objection to form.
19    A.  I don't know if you'd call it an opinion.
20 It's knowledge.  I knew that they were in the
21 business, and I knew they provided services.  And
22 some of the descriptions are their words, but the
23 fact that they were in the business was independent
24 knowledge.
25 BY MR. HEARD:

Page 96

1     Q.  Moving on.  Anything else in Paragraph 14?
2     A.  Yes.  I knew they were in the market.  I
3  took their own description to say that they were a
4  market leader.  I knew they were involved in
5  explosive charges.  And -- and, you know, their
6  description of being a pioneer in the development
7  was their words, but the fact that they were working
8  on reactive liners, I found out about.  So that's
9  the independent part of that, if you will.
10       Same thing in 15, I talk a bit about my
11 understanding that -- of Dyna's position based on
12 Dyna's testimony.
13    Q.  And is that an opinion that -- again,
14 that's an understanding you developed from reading
15 deposition testimony in this case, it's not an
16 opinion that you formed based on your independent
17 technical expertise?
18    A.  Not independent of the testimony.  My
19 opinion based on the testimony and what I understood
20 it to mean.
21    Q.  And specifically, you recount what the Dyna
22 witnesses testify, don't you?
23    A.  Correct, I do.
24    Q.  Okay.
25    A.  16 refers to the master's thesis that I

Page 97

1  looked through.  Again, it's -- I -- I got it
2  through the lawyers, but it's not written by GEO
3  people, it's a master's thesis that Dyna referred
4  to.
5        And then we've already talked about the
6  last sentence in 16, where I was unable to find a
7  document that shows Dyna considered, tested, or
8  manufactured a shaped charge containing both nickel
9  and aluminum until 2007.  I looked at some
10 documents, I saw the date, I asked if there was
11 anything else.  I didn't do an independent search of
12 everything that's been produced.
13       17 refers to some more testimony by Dyna.
14 Specifically, on page 9, the testimony is quoted,
15 where there's a specific question asked about when
16 was the first time DynaEnergetics had considered
17 using both nickel and aluminum in a reactive shaped
18 charge liner, was it in 2007?  And the answer was
19 is, "Right.  That may be correct, yes."
20    Q.  So you're just referring to deposition
21 excerpts here?
22    A.  Again, it's the same thing.  This is not
23 something GEO said, this is something Dyna said.
24    Q.  But you're not offering -- nothing in what
25 you've just described is -- is expressing an opinion

Page 98

1  that you formed based on your expertise; is that
2  fair?
3      A.  Well, it's not my testimony.  It's Dyna's
4  testimony.  I'm not sure what you're asking there.
5      Q.  There's no -- is there an opinion that you
6  can point to that is formed as a basis -- on the
7  basis of these statements?
8      A.  Well, my opinion is, he was telling the
9  truth; and therefore, 2007 was the first time that
10 Dyna used it.
11     Q.  And so your opinion is, generally, the
12 witnesses are telling the truth when they're
13 deposed?
14         MR. FOUNTAIN:  Objection to form.
15     A.  Generally, yes.
16 BY MR. HEARD:
17     Q.  Okay.  And we already covered the fact that
18 you didn't consider the testimony of the -- the
19 witnesses that -- Mr. Veehmayer, that testified to
20 the work on the reactive liners in 2007; is that
21 right?
22         MR. FOUNTAIN:  Objection to form.
23     A.  I think that's the testimony you asked if I
24 had seen, and I told you I had not.
25 BY MR. HEARD:

Page 99

1      Q.  Okay.  Let's move on.  Let's skip over to
2  Paragraph 20.
3          MR. HEARD:  Let's go ahead and break
4  for lunch now.
5          THE VIDEOGRAPHER:  Off the record,
6  12:16.
7          (Break taken, 12:16 p.m. to 12:58 p.m.)
8          THE VIDEOGRAPHER:  We're on the
9  record.  The time is 12:58.
10 BY MR. HEARD:
11     Q.  Dr. Wooley, I'd ask you to turn in your
12 report, Exhibit 1, sitting in front of you, to
13 Paragraph 105 on page 60.  Have you found it?
14     A.  Yes.
15     Q.  And this section is in a -- or this
16 paragraph in is three-paragraph section titled,
17 "Dyna Has No Reasonable Belief of Noninfringement";
18 is that correct?
19     A.  Yes.
20     Q.  And in this first paragraph, you discuss
21 Dyna's awareness of the '394 patent; is that
22 correct?
23     A.  I do.
24     Q.  And you note specifically in a sworn
25 interrogatory response, DynaEnergetics represented

Page 100

1  that it was aware of the '394 patent as of
2  August 17th, 2014; is that right?
3      A.  Well, the first statement is, "Dyna's been
4  aware of the '394 patent since at least August 17,
5  2014."
6      Q.  Correct.  And that understanding came from
7  DynaEnergetics' interrogatory response; is that
8  right?
9      A.  Right.  Yes.  I'm sorry, I --
10     Q.  Sure.
11     A.  -- may not have answered your question the
12 way you wanted me to.
13     Q.  No, so then you go on in the next sentence
14 to state that, "Dyna has likely been aware of the
15 '394 patent since much earlier than 2014."  Do you
16 see that?
17     A.  Yes.
18     Q.  So you disbelieve the DynaEnergetics'
19 interrogatory response?
20         MR. FOUNTAIN:  Objection to form.
21     A.  No.  No, I didn't contradict it.  It just
22 says in addition to what they said in 2014, there's
23 additional evidence.
24 BY MR. HEARD:
25     Q.  And, specifically, you point -- you point

Page 101

1  to an e-mail dated April 16th, 2009; is that right?
2      A.  Yes.
3      Q.  And, Dr. Wooley, you're -- you're familiar
4  with patent law, aren't you?
5          MR. FOUNTAIN:  Objection to form.
6  BY MR. HEARD:
7      Q.  Generally speaking, you understand when a
8  patent issues, that that's -- that a patent is not a
9  patent until the date it issues?
10     A.  Generally, I understand a patent is not a
11 patent until it's issued, yes.
12     Q.  Do you know the issuance date of the '394
13 patent?
14     A.  I don't have it memorized, no.
15     Q.  Do you understand that it's July 17th,
16 2012?
17     A.  I recall 2012.  I don't remember the date.
18     Q.  So as of an e-mail April 16th, 2009, there
19 could be no awareness of GEODynamics' patent, could
20 there?
21         MR. FOUNTAIN:  Objection to form.
22     A.  Yeah, I think you're reading into that
23 sentence something that's not in there.  What's your
24 question again?
25 BY MR. HEARD:

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 7 of 12 PageID #: 7457

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only      Dr. Gary Wooley on 07/18/2018      Pages 134..137

Page 134

1  BY MR. HEARD:
2     Q.   So specifically, you -- you didn't believe
3  that it was a -- for instance, a standardized API
4  19B test that he was performing?
5     A.   I don't think it was ever intended to be.
6     Q.   Right.  And you don't believe it was
7  intended to be a -- the following of any standard
8  procedure that has been accepted by the industry?
9     A.   I don't think there was ever an intent to
10 do that.  The purpose was to try to obtain the
11 products of the reaction.
12    Q.   Was it also an objective of the test to
13 simulate the energy that a reactive liner is exposed
14 to downhole?
15    A.   No.  It was clearly never intended to be a
16 downhole simulation.  These are controlled
17 laboratory conditions to try to obtain -- to try to
18 create the reaction and obtain the product.
19    Q.   So it also wasn't -- it wasn't intended to
20 impart the same amount of energy that would be
21 experienced downhole either?
22    A.   No need to do that.
23    Q.   Okay.
24    A.   That's the purpose of laboratory
25 experiments, to be able to control the environment

Page 135

1  and get what you want.
2     Q.   Do you know if the test that he performed
3  was one that was known to produce nickel aluminide
4  reactions under high pressures?
5          MR. FOUNTAIN:  Objection to form.
6     A.   Well, the intent was to create an -- a
7  reaction with an impact that would give us the
8  product of the exothermic reaction for a number of
9  different materials.
10 BY MR. HEARD:
11    Q.   And then your understanding is, the
12 samples -- or at least some of the samples were sent
13 to Dr. DeLeon for x-ray diffraction analysis?
14    A.   That's my understanding, yes.
15    Q.   And you didn't -- you weren't on site in
16 Dr. DeLeon's lab when she performed x-ray
17 diffraction analysis?
18    A.   I was not.  We discussed that some.  And it
19 was my suggestion that, "I don't think I need to be
20 there unless you really want me there.  I just need
21 to see the results."  And I left it up to somebody
22 else to take care of the chain of custody issue of
23 just -- these samples got to her shop.
24    Q.   So you relied on Mr. Hardesty to design and
25 perform the -- the collection tests adequately; is

Page 136

1  that right?
2     A.   Yes.  Well, I observed that he had.  I
3  mean, the intent was to just create the reaction so
4  that we could obtain the product for analysis.
5     Q.   But you relied on Mr. Hardesty to design
6  and actually carry out those tests; is that right?
7     A.   Yes.  I -- I observed and discussed them
8  with him.  But he has extensive experience at
9  running these kinds of tests.  And so he proposed
10 them, we discussed them, I observed them, and
11 observed the test itself, and saw the products.
12    Q.   Did you -- is it fair to say you deferred
13 to him to determine what would, in a suitable
14 manner, detonate and be -- detonate the charges and
15 be able to recover the liner material?
16         MR. FOUNTAIN:  Objection to form.
17    A.   I trusted his extensive laboratory
18 experience to be able to create the reaction.  And
19 it turned out to be proper trust.  He was able to do
20 that.
21 BY MR. HEARD:
22    Q.   And likewise, did you rely on Dr. DeLeon's
23 experience running x-ray diffraction to run those
24 tests and generate the data?
25    A.   Yes.  She has extensive experience running

Page 137

1  those types of analyses and seemed to be perfectly
2  capable, and the results bear that out.
3     Q.   Did -- were you asked to suggest labs to
4  perform the x-ray diffraction?
5     A.   No.
6     Q.   Did you ever provide recommendations to any
7  labs for analytical testing of the accused products?
8     A.   Did not.  I was not asked to and did not.
9     Q.   If you flip back in your report just a few
10 pages to Paragraphs 28 to 33.  It's a section
11 titled, "The '394 Patent."  Do you see that?
12    A.   Yes, sir.
13    Q.   And you note that the -- the inventors of
14 the '394 patent there in Paragraph 28 are Leslie
15 Raymond Bates and Brian Bourne.  Do you see that?
16    A.   Yes.
17    Q.   Have you spoken with either of those
18 inventors?
19    A.   Not that I know of.  Again, they could have
20 been on some of the conference calls.  But to my
21 knowledge, no.
22    Q.   Certainly not in connection with this case,
23 you haven't spoken with them?
24    A.   Correct.
25    Q.   Have you spoken with anyone at QinetiQ

Page 146

1   A.  Yes.
2   Q.  Okay. And, specifically, you address
3  Claims 1, 2, 3, and 28 in the '394 patent; is that
4  right? If it helps, in Paragraph 46, that's what
5  you stated.
6   A.  Yes. I'm just flipping through here. I
7  believe that's correct.
8   Q.  And I just want you to confirm that Claim
9  20 is not addressed in your report. Is that
10 correct?
11  A.  I believe that's correct. Let me look.
12 It's not listed in 46.
13  Q.  And I'm just -- the reason I'm asking --
14  A.  Make -- make sure there's not a typo, is
15 all I'm doing.
16  Q.  No, sure, please do. I -- I'm trying to
17 clarify that -- in the infringement contentions,
18 Claim 20 was listed, and I just want to be --
19 confirm, your understanding is that that is no -- at
20 this point, it's not being asserted against
21 DynaEnergetics.
22  A.  (Reviews document.)
23      Bear with me. I'm flipping through here
24 just to confirm.
25      Yeah, I believe that's correct.

Page 147

1   Q.  Okay.
2   A.  Now, I don't know about the contentions. I
3  believe 20 is not addressed in my report.
4   Q.  Thank you.
5       If you'd flip to Paragraph 56, please.
6  You're addressing an element of the claim -- of
7  Claim 1 referring to a green compacted particulate
8  composition. Do you understand that?
9   A.  Yes, I understand that.
10  Q.  And as -- when Mr. Hardesty performed his
11 collection tests, how did you ensure that the liner
12 maintained as a green compacted particulate
13 composition?
14      MR. FOUNTAIN: Objection to form.
15  A.  Why would I want to do that?
16 BY MR. HEARD:
17  Q.  Well, then -- that's my question. Did --
18 did you not -- you did not confirm whether it
19 remained a green compacted particulate composition
20 following Mr. Hardesty's preparation?
21  A.  Well, the test sample was comprised from a
22 green compacted particulate composition.
23  Q.  And then based on the -- the preparation
24 that Mr. Hardesty did of the electronic initiator,
25 then you understand after that, it was crushed and

Page 148

1  sieved?
2   A.  Well, yes, the green compacted particulate
3  composition was crushed and sieved and then put into
4  the test equipment.
5   Q.  And it wasn't then again -- before being
6  put into the test equipment, it wasn't again green
7  compacted; is that right?
8   A.  No. There was no need to.
9   Q.  Right.
10  A.  No intent to.
11  Q.  Did you do anything to empirically verify
12 the reliability of Mr. Hardesty's collection tests?
13      MR. FOUNTAIN: Objection to form.
14  A.  I don't know what that means.
15 BY MR. HEARD:
16  Q.  Did you perform any separate testing to
17 verify the reliability of the -- the test methods?
18  A.  There's no need to do that. They would be
19 meaningless.
20  Q.  Do you know if there's an error rate
21 associated with Mr. Hardesty's collection tests?
22      MR. FOUNTAIN: Objection to form.
23  A.  There would be no reason to establish an
24 error rate with what he was doing. You're applying
25 something that doesn't apply here.

Page 149

1  BY MR. HEARD:
2   Q.  So in your mind, the -- the collection
3  tests that Mr. Hardesty went through doesn't need to
4  be verified that it's a reliable method?
5       MR. FOUNTAIN: Objection to form.
6   A.  Your error analysis is unrelated to what
7  was done. I don't -- that question has no meaning
8  in these kinds of laboratory tests.
9  BY MR. HEARD:
10  Q.  So you can't -- sitting here today, you
11 couldn't develop or consider how to develop a test
12 to empirically verify the reliability of the
13 collection tests?
14      MR. FOUNTAIN: Objection to form.
15  A.  That would be meaningless. That phrase has
16 no meaning in these tests.
17 BY MR. HEARD:
18  Q.  If you would turn in your declaration to
19 66, please. Do you see there, you indicate that you
20 had spoken with Dr. Arroyave? Do you see that?
21  A.  Yes, that's correct.
22  Q.  And, specifically, you were speaking to him
23 to gain the understanding that nickel and aluminum
24 "in the DPEX shaped charge liner are provided in
25 proportions calculated to produce NiAl upon

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 9 of 12 PageID #:  7459

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only          Dr. Gary Wooley on 07/18/2018          Pages 150..153

Page 150

1  detonation of the shaped charge"?
2      A.  Yes.
3      Q.  Did you rely on Dr. Arroyave's expertise
4  to -- to gain that understanding?
5      A.  I did rely on Dr. Arroyave's expertise.
6      Q.  In Paragraph 69, you state that you "have
7  spoken with John Hardesty, who analyzed the tunnel
8  geometry of the DPEX and HaloFrac charges when fired
9  into Berea sandstone cores."  Do you see that?
10     A.  Yes.
11     Q.  Did you rely on Mr. Hardesty to analyze the
12 tunnel geometry to determine whether an exothermic
13 reaction had taken place?
14     A.  Of course.
15     Q.  Do you know --
16     A.  There's an implication in your questions
17 that I think is off base; and that is, there's
18 something wrong with relying on experts that you
19 hire.
20     Q.  That -- you can leave that to us, to the
21 lawyers to argue.  I'm just asking you questions.
22     A.  Well, I think the implication of your
23 question is there, and I think it's inappropriate.
24              MR. HEARD:  Move to strike the answer.
25     A.  Now, you can -- you can certainly discuss

Page 151

1  the legal stuff.  I don't want anything to do with
2  that.  But it's inappropriate to suggest that
3  there's anything wrong with relying on another
4  expert.  I do that often.  People with expertise
5  like Dr. Arroyave and John Hardesty are people that
6  you rely on for expert opinions.
7              MR. HEARD:  Move to strike the -- the
8  nonresponsive response.
9  BY MR. HEARD:
10     Q.  In Paragraph 69 -- did you do anything to
11 measure the -- the heat of reaction that took place
12 in the samples that were fired?
13     A.  You're talking about the heat of reaction
14 for the -- reaction -- the exothermic reaction?
15     Q.  Yes.
16     A.  Yeah, there were no measurements of that.
17 We were just looking for product.  And never
18 intended to, so there's no reason to measure it.
19     Q.  In Paragraph 70, you discussed the -- that
20 you've reviewed a laboratory report from Texray Lab
21 Services and have spoken with Dr. Arroyave regarding
22 the information in the report.  Is that right?
23     A.  That's correct.
24     Q.  Okay.  And you go on in that paragraph to
25 say you "understand from Dr. Arroyave that the

Page 152

1  formation of NiAl is exothermic in nature; that is,
2  that nickel and aluminum interact via an exothermic
3  intermetallic reaction to create NiAl."  Is that
4  right?
5      A.  Yes, I discussed that with him.
6      Q.  So you would agree that you gained your
7  understanding that -- about the formation of NiAl
8  from Dr. Arroyave?
9      A.  I verified and confirmed some
10 understanding, yes, sir.
11     Q.  So you had a separate understanding before
12 speaking with him?
13     A.  On most of these matters, I did.
14     Q.  But that's not reflected in Paragraph 70?
15     A.  I disagree.
16     Q.  If you could turn to Paragraph 71.  And in
17 this section, you're dealing with the element
18 regarding the electron concentration of 1.5.  Do you
19 understand that?
20     A.  That's correct.
21     Q.  Had you ever heard of Hume-Rothery before
22 your involvement in this litigation?
23     A.  Yes, I had heard of it.  I had not known
24 about it to the extent that I saw in this
25 litigation.  I had heard the name.

Page 153

1      Q.  Had you ever calculated electron
2  concentrations before your involvement in this case?
3      A.  Of course.
4      Q.  In what context?
5      A.  Many different times during the course of
6  my career, including tutoring my high school
7  grandson.
8      Q.  And is your understanding that electron
9  concentration is a ratio of valence electrons to
10 atoms?
11     A.  That's correct.
12     Q.  But for purposes of developing your
13 opinions, you state you've conferred with
14 Dr. Arroyave and agree with his analysis; is that
15 right?
16     A.  Yes.
17     Q.  So did you separately develop an opinion as
18 to whether the -- the metals were provided in
19 respective proportions calculated to give an
20 electron concentration of 1.5, apart from speaking
21 with Dr. Arroyave?
22     A.  I don't know how to separate the two.  I
23 mean, I consulted with him.  I did the calculations
24 independently.  He -- he did them.  We got the same
25 result.

Page 166

1  Dr. Arroyave.
2  BY MR. HEARD:
3      Q.  So it's -- it's really complex?  It
4  requires some theoretical analysis that someone like
5  Dr. Arroyave can speak to?
6          MR. FOUNTAIN:  Objection to form.
7      A.  Not to determine whether or not
8  infringements occurred, but to answer the kind of
9  question you're asking about the degree of
10 infringement; that is, if I'm infringing, but I only
11 have a little bit, how much do I need to cause a
12 sufficient amount of energy to do a good job of
13 cleaning out the perforation tunnel?  That's where I
14 would suggest Dr. Arroyave get involved in the
15 calculations.  But in terms of infringement, I
16 don't -- that's not needed.
17 BY MR. HEARD:
18     Q.  But -- well, then that's not true over the
19 entire spectrum.  To clarify, if proportions are
20 calculated to get Ni2Al, but some trace amount of
21 NiAl is formed, the only way to figure that out is
22 through testing the reactant products and going
23 through XRD and SEM and these various analytical
24 methods, isn't it?
25         MR. FOUNTAIN:  Objection to form.

Page 167

1      A.  No, I would disagree with that.
2  BY MR. HEARD:
3      Q.  And you state in the final sentence of 109
4  that you understand from Dr. Arroyave that NiAl is
5  the most likely compound to form of all the nickel
6  aluminides; and thus, that NiAl is likely to form in
7  nearly any liner containing both Ni and Al powder.
8  Do you see that?
9      A.  Yes.  That's very close to what we were
10 just talking about.
11     Q.  Yeah.  So do you stand by that and believe
12 that?
13     A.  Yes.
14     Q.  And you're aware that the -- the Court, in
15 its claim construction order, said that -- that the
16 patent clearly cannot cover all concentrations of
17 nickel and aluminum?
18         MR. FOUNTAIN:  Objection to form.
19     A.  I don't think that's what it says.  I'll be
20 happy to go over the claim construction if you want
21 to pull it out.  I don't think that's what it says.
22 BY MR. HEARD:
23     Q.  What ratios do you believe would not --
24 NiAl would not likely to be formed?
25         MR. FOUNTAIN:  Objection to form.

Page 168

1      A.  I don't know what you're asking.
2  BY MR. HEARD:
3      Q.  What ratios of nickel and aluminum provided
4  in a liner do you believe would not likely to be
5  formed in -- formed in NiAl in a liner?
6      A.  I think you've got it backwards.  If nickel
7  and aluminum are present, it's very likely that NiAl
8  will be formed, which is what's stated here.  And --
9  and I think you'll find that's Dr. Arroyave's
10 opinion also.
11     Q.  Well, so I -- just going to -- so you can't
12 draw a line as to where, looking at a liner
13 composition -- well, strike that.
14         Stepping back.  Do you believe a liner
15 that contains 50 percent by weight and 50 percent by
16 weight nickel and aluminum would react to form
17 nickel aluminide?
18         MR. FOUNTAIN:  Objection to form.
19     A.  If nickel and aluminum are present, I
20 expect there will be some nickel and aluminum
21 formed.
22 BY MR. HEARD:
23     Q.  In any -- any proportions?
24     A.  That's my expectation, yes.  And I think
25 that fits with Dr. Arroyave, as I mentioned here in

Page 169

1  the report.  It was his opinion that's the most
2  likely thing to occur.
3      Q.  And you're not --
4      A.  Let's use his words, or the words I stuck
5  in here.
6      Q.  You're not concerned that that's contrary
7  to the Court's order, are you?
8          MR. FOUNTAIN:  Objection to form.
9      A.  Which court order?
10 BY MR. HEARD:
11     Q.  The claim construction order.
12     A.  I disagree.  That's not what it says.
13     Q.  Okay.  So it doesn't concern you if -- that
14 that contradicts the Court's claim construction
15 order?
16         MR. FOUNTAIN:  Objection to form.
17     A.  I don't believe it does.  I think your
18 question is inaccurate.
19 BY MR. HEARD:
20     Q.  So looking at Claim 1, then, what's the
21 purpose of having a requirement for an electron
22 concentration of 1.5?  Couldn't the claim just read
23 "a liner with nickel and aluminum in it"?
24         MR. FOUNTAIN:  Objection to form.
25     A.  Well, in -- in one of the claims, it does,

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 11 of 12 PageID #: 7461

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only     Dr. Gary Wooley on 07/18/2018     Pages 210..213

Page 210

```
 1  know what the composition of the material is, what
 2  the liner material is, and you do some -- some --
 3  some chemical analysis of that, and have the
 4  evidence of an exothermic reaction in the tunnel
 5  geometry, then you can get there.
 6     Q.  So looking -- sorry to distract you from
 7  it, but going back to Column 3, lines 57 to 60, you
 8  see that the patent states, "By way of example, an
 9  important feature of the invention is that NiAl
10  reacts only when the mixture experiences a shock
11  wave of greater than approximately 14 gigapascals.
12  This causes the powders to form the intermetallic
13  NiAl with a considerable output of energy."  Do you
14  see that?
15     A.  Yes.
16     Q.  Does the patent here describe the use of
17  NiAl to produce a considerable output of energy?
18     A.  As an example.
19     Q.  Can you identify any portion of the patent
20  that describes the use of NiAl to produce a trivial
21  amount of energy?
22         MR. FOUNTAIN:  Objection to form.
23     A.  I don't think those words are in the
24  patent.
25  BY MR. HEARD:
```

Page 211

```
 1     Q.  Can you identify a portion of the patent
 2  that describes the use of NiAl to produce
 3  insufficient energy to impact the flow
 4  characteristics of the perforation tunnel?
 5     A.  I think you're making all that stuff up.  I
 6  don't think those words are in the patent, nor
 7  they -- should they be.
 8     Q.  Agreed.
 9         You state in your report that, "If
10  one could create a significant amount of NiAl based
11  solely on the composition of the liner, one would
12  necessarily be able to make small amounts of NiAl by
13  altering the liner blend."  What's your support for
14  that claim?
15     A.  Where are you reading?
16     Q.  Paragraph 133.
17     A.  Of the rebuttal report?
18     Q.  Yes.  And the sentence I read to you is at
19  the bottom of that page 54.
20     A.  Okay.  Just a moment, let me get through
21  the whole thing here.  (Reviews document.)
22         Okay.  And what is your question?
23     Q.  What's your basis for the claim that, "If
24  one could create significant amounts of NiAl based
25  solely on the composition of the liner, one would
```

Page 212

```
 1  necessarily be able to make small amounts of NiAl by
 2  altering the liner blend"?
 3     A.  I think that's fairly obvious.  I don't
 4  know what the question about that is.  If you can
 5  make NiAl, you should be able to modify it slightly
 6  and have a small amount of NiAl.  What's -- I don't
 7  understand why that's a question.
 8     Q.  How would a person of ordinary skill change
 9  the proportions of the liner to create small amounts
10  of NiAl?
11     A.  I think it's simply stating the obvious,
12  that if you have a process that creates NiAl, take
13  that as a given, that you should be able to modify
14  it and produce at least small amounts of NiAl.
15     Q.  Can you articulate how, sitting here today?
16     A.  With precision in terms of degrees, no.
17  But it's fairly clear logic, it seems to me, that if
18  you have a process that produces a product, you can
19  modify that process slightly and still get some of
20  the same product.
21     Q.  Would a person of skill be able to produce
22  small amounts of NiAl by introducing an additional
23  metal into the liner?
24     A.  That's possible.
25     Q.  How about just by changing the proportions
```

Page 213

```
 1  of nickel and aluminum in the liner?
 2     A.  Yes, that's possible.  All of that
 3  suggests, as long as you're getting the NiAl, it
 4  doesn't matter what else you're doing.
 5     Q.  What would a person of ordinary skill need
 6  to rely on to determine whether adding a metal, such
 7  as copper, would interfere with the production of
 8  NiAl?
 9     A.  Probably a look at the chemistry.  Look at
10  the phase diagram and decide if there's going to be
11  anything that would prevent the formation of NiAl.
12  But the logic is pretty easy, it's not complicated,
13  unless you're going to completely change the
14  chemistry somehow.
15     Q.  Well, and that's the question.  Do you know
16  how the chemistry could be changed to reduce the
17  amount of NiAl you produce?
18     A.  Given that the fact if NiAl -- if nickel
19  and aluminum are involved, if you leave those two
20  constituents in there, the most likely thing is,
21  they're going to form NiAl.  You know, you may be
22  able to do some other things at the same time,
23  simultaneously.  But if those two are involved, the
24  most likely thing is, they'll get together and form
25  NiAl.
```

Case 2:17-cv-00371-RSP   Document 121-2   Filed 07/27/18   Page 12 of 12 PageID #: 7462

GEODYNAMICS, INCORPORATED VS. DYNAENERGETICS US., INC., ET AL.
Outside Counsel Only    Dr. Gary Wooley on 07/18/2018    Pages 214..217

Page 214

1  Q.  And you gained that understanding from
2  Dr. Arroyave?
3  A.  Yeah, I confirmed it with him.  It seemed
4  to me that's -- that made sense, but he -- he
5  confirmed it and said yeah, the probabilities are
6  high that that's the most likely thing to occur.
7  Q.  How would you quantify the amount of NiAl
8  you're getting?
9  A.  Well, it's just a chemical balance.  I
10 don't understand what you're asking.
11 Q.  Is there prior art that supports the --
12 what you're stating that supports that you could
13 just change the -- easily change to have small
14 amounts of NiAl?
15 A.  I think it's a common sense thing, unless
16 you're going to modify the chemistry completely,
17 which is a possibility.  But based on my
18 understanding and Dr. Arroyave's opinion, it's most
19 likely that the nickel and aluminum will combine to
20 form NiAl.
21 Q.  But in what quantity, you're not sure?
22 A.  Well, the quantities formed will depend on
23 a lot of different variables.
24 Q.  And that's what I'm getting at.  Do you
25 know what variables can be altered to change the

Page 215

1  amount of NiAl you're going to get?
2  A.  Yeah.  Change the amount of nickel and the
3  amount of aluminum.
4  Q.  And do you know how that -- those changes
5  would affect the -- the resultant amount of NiAl?
6  A.  If that's all that's in there, it's a
7  pretty simple chemical balance.  Now, if you start
8  changing the chemistry with other materials, then
9  you've got to look at it more closely.
10 Q.  So adding an element -- a third element
11 into the equation, like copper, it changes the
12 chemistry?
13 A.  At least some of it, yes.  Again, we're
14 looking at probabilities of forming, and the high
15 probability is, if nickel and aluminum are present,
16 they're going to get together and form NiAl.  There
17 may be some other things that happen, but that's the
18 most likely thing that will happen.
19 Q.  Does copper react with aluminum in a liner
20 that contains nickel and aluminum?
21 A.  Say that again.  Let me make sure I get the
22 elements straight.
23 Q.  In a liner that contains nickel and
24 aluminum, and then copper is introduced, does copper
25 react with the aluminum in that blend?

Page 216

1  A.  Could.
2  Q.  Have you seen evidence of that?
3  A.  Where?
4  Q.  Have you seen evidence of it?
5  A.  I don't know where you're referring to.
6  Q.  I'm asking, have you ever seen evidence
7  of --
8  A.  Oh.
9  Q.  -- a system in which --
10 A.  Not that I recall.  Again, I'd refer you to
11 Dr. Arroyave on that.  He may have seen a lot more
12 evidence of that kind of chemical reaction.
13 Q.  And if there is that -- if there is a
14 reaction between copper and aluminum, would that
15 mean that there is some portion of the aluminum
16 that's not reacting with the nickel?
17 A.  Sure, that's possible.
18 Q.  And can you quantify the extent of that
19 interference?
20 A.  Much more likely that the nickel and
21 aluminum will get together than the aluminum and the
22 copper.
23 Q.  And, again, you base that on your
24 understanding that you confirmed with Dr. Arroyave?
25 A.  Yes.

Page 217

1  Q.  Do the claims of the '394 patent encompass
2  liners containing nickel, aluminum, and tungsten,
3  where the tungsten is -- accounts for the 70 percent
4  of the liner by weight?
5  A.  And what's your question about that?
6  Q.  Does the '394 patent cover that ratio?
7  Does it cover a liner blend that contains nickel,
8  aluminum, and tungsten, where the tungsten is
9  70 percent by weight of the liner?
10       MR. FOUNTAIN:  Objection to form.
11 A.  Yeah, I don't think those percentages
12 matter.  If you've got nickel and aluminum together,
13 they're likely to form -- if you have nickel and
14 aluminum together, they're likely to form NiAl
15 intermetallic compound, as a product.  There may be
16 some other things that go on, but they'll still do
17 that.
18 BY MR. HEARD:
19 Q.  So you do -- is your opinion that, yes, the
20 '394 patent does encompass liners that have an inert
21 metal, like tungsten, up to 70 percent?
22 A.  Regardless of the fracture.
23 Q.  Who are the inventors of the '394 patent?
24 A.  We just went over that a moment ago.  You
25 asked if I knew them.  Leslie Raymond Bates and